

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00157-CV

_____

IN THE INTEREST OF N.H., M.H., K.R., B.K., H.K., H.K., AND H.T.,
CHILDREN

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-435130-08

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

In this appeal, Appellant M.M. (Mother) appeals the trial court's order terminating her parental rights to her children K.R. (Kenneth), B.K. (Breanna), H.J.K. (Hank), H.S.K. (Hudson), and H.T. (Holly) (collectively the Children); Appellant J.T. appeals the trial court's order terminating his parental rights to Holly; and Appellant K.R. appeals the trial court's order terminating his parental rights to Kenneth.[1] In three issues, Mother contends the evidence is legally and factually insufficient to support the termination of her parental rights under Family Code Subsections 161.001(b)(1)(D) and (E) and that the evidence is legally and factually insufficient to support the trial court's best-interest finding. In three issues, J.T. similarly contends that the evidence is legally and factually insufficient to support the termination of his parental rights under Family Code Subsections 161.001(b)(1)(D) and (E) and that the evidence is legally and factually insufficient to support the trial court's best-interest finding. And in six issues, K.R. contends that the evidence is legally and factually insufficient to support the termination of his parental rights under Family Code Subsections 161.001(b)(1)(D), (E), (N), (O), and (Q) and that the evidence is legally and factually insufficient to support the trial court's best-interest finding.

---

[1] To protect the identities of the children in this case, we use aliases to refer to them and initials to refer to their fathers. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

As to Mother's and K.R.'s complaints relating to Kenneth, we will hold that the Department of Family and Protective Services (the Department) abandoned its request to terminate Mother's and K.R.'s parental rights to Kenneth when unequivocal testimony was presented at the termination trial that the Department was not seeking to terminate such rights. We will thus sustain Mother's and K.R.'s complaints as to Kenneth. With respect to Mother's complaint as to Breanna, Hank, Hudson, and Holly, we will hold that the evidence is legally and factually sufficient to support the termination of Mother's parental rights to them under Family Code Subsections 161.001(b)(1)(D) and (E) and that the evidence is legally and factually sufficient to support the trial court's best-interest finding as to them. With respect to J.T.'s complaint as to Holly, we will hold that the evidence is legally and factually sufficient to support the termination of his parental rights under Family Code Subsections 161.001(b)(1)(D) and (E) and that the evidence is legally and factually sufficient to support the trial court's best-interest finding. We will thus affirm in part and reverse and remand in part.

## II. BACKGROUND

### A. Mother, Her Children, Their Fathers, and the Prior Involvement of the Department

Mother has nine children, consisting of the five that we have described as the Children, along with four others.[2] The nine children, in order of birth, consist of the following: E.H. (Ezra), N.H. (Natalie), M.H. (Michael), Kenneth, Breanna, Hank, Hudson, Holly, and E.T. (Emily).[3] Ezra's father is R.Y.—a person not a party to the underlying case. The father of Natalie and Michael is unknown. K.R. is Kenneth's father. C.K.—who is not a party to this appeal—is Breanna's father. At various times during this case, Mother indicated that C.K. was the father of Hank and Hudson, while at other times, Mother indicated that another man was their father.[4] J.T. is the

---

[2]While Mother's parental rights were terminated as to only the Children, we mention the other four of Mother's children where relevant to our discussion.

[3]Ezra was born in April 2003, Natalie was born in June 2006, Michael was born in January 2008, Kenneth was born in July 2009, Breanna was born in November 2010, Hank and Hudson were born in May 2017, Holly was born in November 2019, and Emily was born in March 2021. Hank and Hudson are twins. It is unclear from the record which is the older twin.

[4]The record reflects that C.K. died in early January 2022 during a break between the termination trial, which took place over several days in late 2021 and early 2022. While Mother had indicated that C.K. was the father of Hank and Hudson prior to C.K.'s death, after C.K.'s death, Mother stated that another man was their father. The trial court terminated C.K.'s parental rights to Breanna, Hank, and Hudson in the same order from which Mother, J.T., and K.R. appeal. No appeal was made pertaining to the termination of C.K.'s parental rights.

4

father of Holly and Emily. At the time of the termination trial, J.T. had been residing "[o]n and off" with Mother for "a few years."

Mother is no stranger to the Department. Letitia White, a Department investigator, testified at the termination trial that the Department had received over twenty intakes concerning Mother and that the vast majority of the intakes had resulted in a "reason to believe" finding by the Department. White recounted that in the prior cases filed by the Department involving Mother, there had been "[l]ots and lots of domestic violence" and that there had also been "some physical abuse of . . . the children [where they] had marks and bruises that were not consistent with the story that [Mother] had given[.]" White further recounted that Mother's children had been removed on several prior occasions, detailing that they had been removed once due to concerns with Mother's mental health, once because of a "drug case," and once after Mother had been placed in jail because of a probation violation.

## B. The Department's 2020 Investigation and Removal of the Children

White testified that she had received two intakes relating to the family in 2020, one in May 2020 and the other in June 2020. White stated that the first intake allegation was of neglectful supervision, explaining that Ezra had been smoking marijuana and that while Mother was aware of Ezra's marijuana use, she was unable to

stop him. Ezra was seventeen at the time of the intake, and he had recently been returned to Mother's care on a monitored return.[5]

White spoke to Mother following the first intake, and Mother told White that she had tried to stop Ezra from smoking marijuana but that she could not control what he was doing. White also interviewed Ezra after the first intake, and he indicated to her that "he had been smoking marijuana for years" and that Mother had told him not to smoke marijuana in the home. Mother admitted to White that she also used marijuana, although Mother indicated that she did not use it at home. Mother told White that she and J.T. would leave the home for the night, use marijuana, and then return to the home.[6] Mother also admitted to White that she had been using cocaine.

White testified that the second intake regarding the family was an allegation of physical abuse and medical neglect, explaining that Kenneth had said he was afraid to go home because he was abused by Mother and his older siblings and that Holly was losing weight due to problems digesting her formula. White spoke to Mother following the second intake, and Mother denied the allegations.[7] White interviewed

---

[5]White testified that Ezra had a "long history" of smoking marijuana prior to his return to Mother's care.

[6]Mother did not indicate who was watching her children when she and J.T. left the home to use marijuana.

[7]Mother did admit to White that Kenneth had been hit in the head with a toy, necessitating stitches. At the termination trial, Mother described that Kenneth had

6

Kenneth, and Kenneth told White that he was afraid to be at Mother's home, that Ezra and Natalie hit him and his younger siblings "all the time for anything," that Natalie was often left to care for "all of the kids," and that he was spanked by Ezra and Natalie. Kenneth also described drug use in the home, explaining that "[J.T.] smokes marijuana with [Ezra] in the bathroom and on the patio all the time [and] that the house always smells like marijuana."[8] Kenneth also indicated that "[Mother] stays in her room all day and smokes marijuana in her room."[9]

White visited the family's home as part of her investigation and observed that the home smelled like marijuana, with the smell being strongest in Ezra's room. White acknowledged that "[t]he home was clean and appropriate . . . for the most part," but she also testified that "there was a very strong odor of urine every time [she] went into the house and into the children's bedrooms."

During her investigation, White spoke with Mother and requested that she and her children be tested for drugs; Mother refused, and the Department sought an order

---

been hurt while playing with a plastic toy ax with some of the other children. Mother stated that Ezra was "doing the ax in a throwing direction" and that "the end of the plastic ax flew off and hit [Kenneth] . . . in his forehead." Mother stated that she took Kenneth to the emergency room because he had an open gash and needed stitches.

[8]Kenneth was not the only one who recounted to White that J.T. smoked marijuana with Ezra. White testified that Natalie, Michael, and Breanna also told her that J.T. had smoked marijuana with Ezra.

[9]White testified that in a later interview with Kenneth, Kenneth told her that he had lied about what he had told her previously, and he asked her why she kept coming back to his home.

to investigate. The order to investigate was granted, and Kenneth, Breanna, Hank, and Hudson were each tested for drugs in late July 2020. Kenneth tested positive for cannabinoids, Breanna tested negative for all drugs, Hank tested positive for cocaine and cannabinoids, and Hudson tested positive for cocaine and cannabinoids. The Department removed the Children, along with Natalie and Michael, on or about July 29, 2020, and they were initially placed with various family members.[10] Approximately one week after the Children were removed, Holly's hair was collected and submitted for a drug test. Holly's hair sample tested positive for amphetamine, methamphetamine, cocaine, and cannabinoids.

Around the time of removal, the Department filed its petition for termination. In its live petition, the Department sought termination of Mother's parental rights to the Children, Natalie, and Michael based on the predicate termination grounds set forth in, among other subsections, Subsections (D) and (E) of Section 161.001(b)(1) of the Family Code; the Department sought termination of J.T.'s parental rights to Holly based on the predicate termination grounds set forth in, among other subsections, Subsections (D) and (E) of Section 161.001(b)(1) of the Family Code; and the Department sought termination of K.R.'s parental rights to Kenneth based on the predicate termination grounds set forth in, among other subsections, Subsections

---

[10]White testified that she did not remove Ezra because he "left the house in an Uber" on his own.

8

(D), (E), (N), (O), and (Q) of Section 161.001(b)(1) of the Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (Q).

## C. The Service Plans Developed for Mother, J.T., and K.R.

At the termination trial, Amy Rodgers, the OCOK[11] permanency specialist assigned to the case, testified that she developed service plans for Mother, J.T., and K.R. Rodgers testified that she provided Mother and J.T. copies of their respective service plans in person and that she provided K.R. with a copy of his service plan by mail because he was incarcerated.[12]

### 1. Mother's Service Plan and Evidence of Drug Use

Mother's service plan required that she complete parenting classes, FOCUS for Mothers[13] classes, and individual counseling. It also required that she complete a drug and alcohol assessment, that she complete a psychological evaluation, that she submit to random drug testing, and that she maintain stability with employment and housing. Rodgers testified that Mother had substantially complied with her service plan. To

---

[11]As our court has explained, "OCOK is a private provider of community-based care that contracts with the Department to provide 'foster care case management, kinship, and family reunification services' in parts of the state, including Tarrant County." *In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *2 n.4 (Tex. App.—Fort Worth Oct. 21, 2021, pet. denied) (mem. op.).

[12]Rodgers testified that K.R. had been incarcerated throughout the pendency of the Department's case.

[13]Mother explained that FOCUS for Mothers classes differed from typical parenting classes in that they taught mothers to become better parents by focusing on themselves.

9

that end, Rodgers testified that Mother completed parenting classes, completed FOCUS for Mothers classes, and that she was engaged in individual and family counseling and had completed a psychological evaluation. Mother testified that she had also completed a drug assessment and drug classes, that she had been living in the same apartment for over three years, and that she had two jobs, one of which she had held for two years.

As to Mother's drug use, Mother admitted that she had used marijuana "a few months prior to the children being removed," and she acknowledged that she had previously been incarcerated "for maybe two months" stemming from possession of marijuana. In December 2020—five months after removal—Mother's hair was tested for drugs, and the results were positive for cocaine. Those test results indicated that Mother had a cocaine metabolite level of 3856. Three months later, in March 2021, Mother again tested positive for cocaine. Those test results indicated that Mother had a cocaine metabolite level of 4026. Mother had expressed to Rodgers that she was not sure why she tested positive for cocaine on those occasions, maintaining that she had not used cocaine since the beginning of the case. To that end, Mother testified that she had last used cocaine in August 2020 and that she had also used cocaine "[m]aybe a few months prior to that." When asked how many times she had used cocaine during 2020, Mother stated, "I don't know. I don't keep count."

## 2. J.T.'s Service Plan and Evidence of Drug Use

J.T.'s service plan required that he complete parenting classes, FOCUS for Fathers classes, and individual counseling. It also required that he complete a drug and alcohol assessment and that he submit to random drug testing. J.T. testified that he had completed parenting classes, FOCUS for Fathers classes, individual counseling, and a drug and alcohol assessment. Rodgers confirmed that J.T. had completed a majority of his services, but she also recounted that he had missed two drug tests—one in November 2021 and one in December 2021. Rodgers also testified that J.T. tested positive for opiates during the case, with the test results indicating that J.T.'s urine had been collected in May 2021 and found to be positive for codeine and morphine. J.T. explained that the positive test result occurred because he had sustained a work injury the day before the test and that he had taken Tylenol 3, a controlled substance.[14] J.T. admitted that he did not have a prescription for the Tylenol 3, and he pled the Fifth Amendment when asked whether he had received the Tylenol 3 from Mother.[15] Rodgers testified that J.T. had told her that he had received the medication that caused the positive test result from Mother.

---

[14]*See Miles v. State*, 357 S.W.3d 629, 640 n.5 (Tex. Crim. App. 2011) (Cochran, J., concurring) (explaining that Tylenol 3 is a "type of medicinal codeine [that] falls into Penalty Group 3"); *see* Tex. Health & Safety Code Ann. § 481.104 (Penalty Group 3).

[15]Mother was working in a nursing home as a geriatric nurse at the time of the termination trial.

At the termination trial, J.T. was asked whether he had smoked marijuana "with children," and J.T. admitted that he had smoked marijuana with children "[p]robably one time in the past."[16] Mother testified that she knew that J.T. had smoked marijuana with Ezra "a couple of times" and that she had told J.T. that she thought it was inappropriate. Mother acknowledged that J.T. smoked marijuana with Ezra even after she had told him that it was inappropriate and that she again told J.T. that it was inappropriate. J.T. also admitted that he had used cocaine "once [or] twice" in the past, although he could not recall when he had last used cocaine.

### 3. K.R.'s Service Plan

K.R.'s service plan required that he complete parenting classes, domestic violence classes, and individual counseling. The record reflects very little regarding K.R.'s attempts to complete his service plan—for that matter, the record reflects very little regarding K.R. Rodgers simply testified that K.R. had taken multiple classes while incarcerated.

## D. Emily's Birth and Her Positive Drug Test

Emily was born in March 2021, during the pendency of this case. Kimara Burnside, an investigator with Child Protective Services, testified that she had received an intake pertaining to Emily in April 2021 following an incident where "[Mother] had provided [Emily] with large doses of children's Benadryl." Mother explained that she

---

[16]It is unclear from J.T.'s testimony who he was referring to when he admitted to smoking "with children."

had been very exhausted and had not noticed how much Benadryl she was providing Emily. Emily was later removed from Mother in April 2021. Four days after removal, Emily's hair was collected and submitted for a drug test. The test came back positive for amphetamine and methamphetamine.[17]

## E. Evidence of Domestic Violence

Mother testified of numerous past instances where she had been the victim of domestic violence. She stated that from 2005 through 2008, she was in a relationship with a man—not one of her children's fathers—who perpetrated domestic violence against her "[t]he whole time [they] were together." Mother also testified that domestic violence occurred between her and K.R., although she did not elaborate on that violence.[18] Mother testified that some of the domestic-violence incidents had occurred in front of her children.

As to J.T., Mother testified that she had to call the police on "[m]aybe three" occasions due to domestic-violence incidents involving J.T. She stated that she had called the police in December 2018 due to an incident with J.T. and that he was convicted of assault bodily injury of a family member as a result of that incident. Mother also described calling the police after an incident that occurred in May 2019,

---

[17]Mother and J.T. were tested for drugs around this time, and they both tested negative.

[18]Mother testified that K.R. had been convicted of assaulting other women, although, again, Mother did not elaborate.

while she was pregnant with Holly, where J.T. wanted Mother to give him money to buy marijuana. Mother testified that an argument ensued between them, that she left her home after the argument, and that she later got a call from a neighbor saying that Mother's home had been set on fire. Mother also testified that she had called the police in April 2020 after J.T. broke a window in her apartment and that all of her children were present when that incident occurred. Nonetheless, Mother testified that she could not recall any instances of domestic violence involving J.T. that had occurred in front of her children. Mother also described an incident that occurred in September 2020—while she was pregnant with Emily—where she and J.T. got into an argument and he struck her in the face.[19]

At the termination trial, J.T. testified that he had a pending assault case. J.T. pled the Fifth Amendment when asked whether that assault case stemmed from a September 2020 incident where he struck Mother "with a closed fist two to three times." J.T. also pled the Fifth Amendment when asked whether he had struck Mother in May 2019, when asked whether he had ever assaulted Mother while she was pregnant with Holly or Emily, and when asked whether he had assaulted Mother in December 2018 while Hank and Hudson were present. J.T. also pled the Fifth Amendment when asked whether his bond conditions stemming from the pending

---

[19]Mother testified that she could not recall whether J.T. punched or slapped her on this occasion. Burnside, however, testified that Mother had told her that J.T. had hit Mother's face with a closed fist while Mother was pregnant with Emily.

14

assault case prevented him from contact with Mother and when asked whether he had been living with Mother throughout the case.[20]

**F. The Children's Placements and Rodgers's Testimony that the Department was Not Seeking Termination as to Kenneth**

Rodgers, the OCOK permanency specialist, testified that Breanna and Holly were living in a foster home that was adoption motivated and that they had bonded well with the foster family.[21] The foster father for Breanna and Holly testified that he would make efforts for the siblings to see each other if they were placed separately. Rodgers testified that Hank and Hudson were also living in a foster home that was adoption motivated and that they had bonded well with the foster family. Rodgers testified that the foster parents were meeting the respective needs of Breanna, Holly, Hank, and Hudson. Rodgers testified that Kenneth was living in a temporary emergency placement in a foster home setting. She indicated that Kenneth had been placed in that setting because of "significant concerns with his aggressive behaviors."[22]

---

[20]J.T.'s criminal defense attorney testified that one of J.T.'s bond conditions was that he have no contact with Mother, and any contact with Mother would have violated J.T.'s bond conditions. The record reflects that J.T. had been living with Mother during at least part of the time that the bond conditions were imposed.

[21]Emily was also living in the foster home with Breanna and Holly.

[22]Rodgers testified that Kenneth had been "in about 13 placements" since removal, including being hospitalized in a psychiatric hospital on "at least five occasions."

Notably, at the termination trial, Rodgers stated that the Department was asking the trial court to terminate the respective parents' parental rights to the four youngest children involved in the suit—Breanna, Hank, Hudson, and Holly—but that the Department was not asking the trial court to terminate the respective parents' parental rights to the three oldest children involved in the suit—Natalie, Michael, and Kenneth. Later in the trial, Rodgers confirmed that the Department was not seeking termination for the "three oldest kids in this case," and Rodgers clarified that the "three oldest kids in this case" referred to Natalie, Michael, and Kenneth.

## G. The Trial Court's Interviews of Natalie, Michael, Kenneth, and Breanna

As part of the termination trial, the trial court interviewed Natalie, Michael, Kenneth, and Breanna in chambers, and a record of the interviews was made part of the record in this case. *See* Tex. Fam. Code Ann. § 153.009(a), (b), (f).

During the trial court's interview of Natalie, Natalie stated that she desired to stay with Mother and that she wanted to be with her family. Natalie also stated that she never saw drugs at Mother's home and that the men at Mother's home were "all right."

During the trial court's interview of Michael, Michael stated that there were certain things he liked about living with Mother—like going out to eat and going to different places—but he also stated that one thing he did not like about living with Mother was that he was subjected to "[a]buse." Michael indicated that Mother "would beat [the children] with, like different things." When asked by the trial court

16

what kind of things Mother would hit the children with, Michael indicated that he did not want to tell the trial court because he was afraid that he would not go home if he told. Michael was asked by the trial court if there were "men that were bad" at Mother's house; Michael answered "[m]ainly one" and indicated that he was referring to J.T. While Michael indicated that he desired to be returned to Mother and his siblings, he also stated that he did not know whether he would be safe at Mother's home.

During the trial court's interview of Kenneth, Kenneth stated that living with Mother was "a nightmare." When asked by the trial court to elaborate, Kenneth indicated that while living with Mother, he would "be scared for [his] life to go ask her for something." Kenneth also indicated that he was worried that if Mother had another baby, she was going to tell the other children to take care of the baby because "she sleeps all day because she works in the nighttime." Kenneth stated that he did not want to go back to living with Mother. As to J.T., Kenneth described J.T. as the "boyfriend that burned down the other house," and while Kenneth stated that J.T. had never hurt him, Kenneth indicated that J.T. had hurt Mother, stating, "[J.T.] knocked her out." Kenneth stated that he liked the foster home in which he was living but that the foster mother could not adopt him.

During the trial court's interview of Breanna, Breanna stated that she was safe and happy with her current placement with her foster family. Breanna acknowledged, however, that she also felt safe with Mother and that she would prefer to "go back

17

home" with Mother. But Breanna also indicated that she did "[n]ot really" remember living with Mother.

## H. The Termination Order

Following the termination trial, the trial court issued a ruling finding that: (1) Mother had engaged in conduct under Subsections (D) and (E) of Family Code Section 161.001(b)(1) and that termination of Mother's parental rights was in the best interest of the Children, including Kenneth; (2) termination of Mother's parental rights to Natalie and Michael was not in the best interest of Natalie and Michael; (3) J.T. had engaged in conduct under Subsections (D) and (E) of Family Code Section 161.001(b)(1) and that termination of J.T.'s parental rights was in Holly's best interest; and (4) K.R. had engaged in conduct under Subsections (D), (E), (N), (O), and (Q) of Family Code Section 161.001(b)(1) and that termination of K.R.'s parental rights was in Kenneth's best interest. Mother, J.T., and K.R. appeal from that termination order.

## III. DISCUSSION

## A. The Department's Abandonment of Its Pleadings to Terminate Mother's and K.R.'s Parental Rights to Kenneth

As a preliminary matter, we will address whether the Department abandoned its pleadings to terminate Mother's and K.R.'s parental rights to Kenneth. That issue is implicated by Mother's and K.R.'s respective complaints that the evidence is legally and factually insufficient to support the trial court's termination order. *See* Tex. R.

App. P. 38.1(f) (providing that issue will be treated as covering every subsidiary question fairly included).

A trial court's final order must be supported by the pleadings. *In re E.H.*, No. 04-20-00440-CV, 2021 WL 799890, at *2 (Tex. App.—San Antonio Mar. 3, 2021, no pet.) (mem. op.). An order terminating parental rights that is not supported by a pleading seeking termination of the parent–child relationship is erroneous and reversible. *Id.*; *In re T.M.*, No. 07-20-00103-CV, 2020 WL 4773207, at *2 (Tex. App.—Amarillo Aug. 17, 2020, no pet.) (mem. op.). When a party abandons a claim that it had made in its live pleading, that pleading will no longer support a judgment on the abandoned claim. *E.H.*, 2021 WL 799890, at *2 (citing *T.M.*, 2020 WL 4773207, at *3). "A party abandons a pleading when it unequivocally states in open court it no longer seeks the pleaded relief." *Id.* Formal amendment of the pleadings is not required to show abandonment; a stipulation or admission made in a judicial proceeding by the parties or their attorneys may form the basis for abandonment. *T.M.*, 2020 WL 4773207, at *2; *In re M.F.L.*, No. 10-16-00256-CV, 2016 WL 7477929, at *1 (Tex. App.—Waco Dec. 28, 2016, no pet.) (mem. op.). Whether a party has abandoned a pleading is a question of law that we review de novo. *E.H.*, 2021 WL 799890, at *2; *T.M.*, 2020 WL 4773207, at *2.

Here, the Department filed its live pleading on October 6, 2021, which was the first day of the termination trial. In that pleading, the Department sought the termination of Mother's parental rights as to Kenneth and sought the termination of

19

K.R.'s parental rights as to Kenneth.  At a later date in the termination trial—

January 25, 2022—Rodgers testified as follows:

> [Department's Counsel]:  So you're asking the Court to terminate the parents' parental rights as to the four youngest but not the three oldest; is that right?
>
> [Rodgers]:  Correct.
>
> . . .
>
> [Attorney Guardian Ad Litem for Natalie and Michael]:  Now, you testified here today that the Department is not seeking termination for the three oldest kids in this case; is that correct?
>
> [Rodgers]:  Yes.
>
> [Attorney Guardian Ad Litem for Natalie and Michael]:  And that's [Natalie], [Michael], and [Kenneth], correct?
>
> [Rodgers]:  Yes.

In reviewing the above exchange, we first examine whether Rodgers's testimony should be imputed to the Department.  We note that Rodgers described herself as the OCOK permanency specialist at the termination trial—not as a Department employee.  But, as we discussed above, OCOK contracts with the Department to provide case management services for the Department in Tarrant County.  *M.M.*, 2021 WL 4898665, at *2 n.4.  In a recent opinion, we stated that an OCOK caseworker "effectively served as the Department's agen[t]."  *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *4 n.11 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.).  And, curiously, we note that in the Department's

20

response brief to K.R.—a response brief that requested reversal of the trial court's termination order as to K.R.—the Department referenced that it had abandoned its efforts to terminate K.R.'s parental rights, pointing to a different exchange by Rodgers at the termination trial where she stated that the Department did not wish to terminate the parental rights of K.R. Given that the Department concedes that reversal is proper as to K.R. because Rodgers testified that the Department did not wish to terminate K.R.'s parental rights, we fail to see why Rodgers's broader testimony that the Department did not seek termination of any of the parents' respective parental rights to Kenneth would be unavailing. Rodgers's testimony is thus imputed to the Department.

We next examine whether Rodgers's testimony was unequivocal. Unequivocal means "[u]nambiguous; clear; free from uncertainty." *Unequivocal*, Black's Law Dictionary (11th ed. 2019). Here, Rodgers's testimony was unambiguous, clear, and free from uncertainty. She testified, in no uncertain terms, that the Department was not seeking termination as to Kenneth. The one issue that arguably could have muddied the waters—whether Kenneth was one of the "three oldest kids in this case"—was cleared up when Rodgers confirmed that she was referring to Natalie, Michael, and Kenneth.

Because the Department unequivocally stated in open court that it was not seeking termination as to Kenneth, we hold that the Department abandoned its pleadings to terminate Mother's and K.R.'s parental rights to Kenneth. *See E.H.*,

21

2021 WL 799890, at *2 (holding that Department abandoned its pleadings seeking termination of parent's parental rights when Department caseworker expressly testified that Department was not seeking termination of such rights and Department's attorney announced at the beginning of trial that Department was no longer seeking termination of such rights); *T.M.*, 2020 WL 4773207, at *3 (holding that Department abandoned its pleadings seeking termination of parent's parental rights when Department caseworker expressly testified that Department was not seeking termination of such rights).  We thus sustain Mother's three issues as they relate to Kenneth, and we sustain K.R.'s six issues.

## B.  Conduct Grounds

In their first two respective issues, Mother and J.T. each argue that the evidence is legally and factually insufficient to support termination under Family Code Subsections 161.001(b)(1)(D) and (E).

### 1.  Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence:  (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest.  Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Evidence is clear and convincing if it "will produce in the mind of the trier of

22

fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged findings to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the conduct grounds. *See* Tex. Fam. Code Ann.

§ 161.001(b)(1)(D), (E); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## 2. Applicable Law

Subsections (D) and (E) provide that the trial court may order the termination of a parent's rights if it finds by clear and convincing evidence that the parent has

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

"Endanger" means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under Subsection (D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. The conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *Id.* For example, "abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.* Illegal drug use by the parent and drug-related criminal

24

activity by the parent "likewise support[] the conclusion that the child[]'s surroundings endanger [his] physical or emotional well-being." *Id.*

Under Subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to a child's well-being may be inferred from parental misconduct standing alone. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* Illegal drug use and its effect on the parent's life and her ability to parent may establish an endangering course of conduct. *Id.* Criminal activity that exposes the parent to incarceration may also endanger a child. *In re I.L.*, No. 02-18-00206-CV, 2018 WL 5668813, at *5 (Tex. App.—Fort Worth Nov. 1, 2018, no pet.) (mem. op.); *In re A.N.D.*, No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.). "Domestic violence, want of self[-]control, and propensity for violence may [also] be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex.

25

App.—Houston [14th Dist.] 2003, no pet.). We may consider conduct that occurred outside the child's presence in our review. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

### 3. Analysis as to Mother

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we conduct a consolidated review of those Subsections. *See In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.); *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.).

Here, the record reflects that Mother has had a persistent problem with illegal drugs. When White investigated the Department's concerns prior to removal, Mother admitted to using marijuana and cocaine. While Mother told White that she did not use marijuana at home, Kenneth told White that "[Mother] stays in her room all day and smokes marijuana in her room." At trial, Mother admitted to using marijuana "a few months prior to the children being removed," and Mother stated that she had used cocaine in the months prior to removal. Mother's use of illegal drugs continued after removal. Mother testified that she had last used cocaine in August 2020—the month following removal.[23] And Mother tested positive for cocaine in December 2020 and March 2021, with her cocaine metabolite levels increasing from 3856 to 4026 over that period.

---

[23]While Mother testified that she had last used cocaine in August 2020, she told Rodgers that she had not used cocaine since the beginning of the Department's case.

26

The record reflects that Mother's drug problems flowed down to her children. Kenneth, Hank, and Hudson were all tested for drugs in late July 2020—around the time of removal. Kenneth tested positive for cannabinoids, Hank tested positive for cocaine and cannabinoids, and Hudson tested positive for cocaine and cannabinoids. Approximately a week after removal, Holly was tested for drugs, and she tested positive for amphetamine, methamphetamine, cocaine, and cannabinoids. The record also indicates that Ezra smoked marijuana in Mother's home, sometimes with J.T., and Mother's attempts to stop them were unsuccessful.[24]

Mother also had a history of involving herself in relationships with violent men. Mother described being in a relationship with a man from 2005 through 2008 who was violent toward her "[t]he whole time [they] were together." She also testified that domestic violence occurred between her and K.R. She described numerous domestic-violence incidents involving J.T., with incidents occurring in 2018, 2019, and 2020. Following one incident with J.T., her house was set on fire, J.T. broke her window during another incident, and J.T. struck her in the face during an incident while she was pregnant with Emily. J.T. was convicted of assault as a result of one of those incidents, and he had a pending assault case at the time of the termination trial.

---

[24]In her brief, Mother argues that "[t]he issues surrounding any alleged drug use in the home [were] created by the Department, not [Mother]," referring to the Department returning Ezra to Mother despite knowledge of his marijuana use. We disagree with Mother's characterization. As detailed above, Mother had her own problems with drugs, and there was evidence that she used drugs in the home.

In her brief, Mother minimalizes the domestic violence, claiming that "[t]here was no domestic violence in front of the [C]hildren and none of the [C]hildren reported exposure to domestic violence." The record suggests otherwise. During the trial court's interview with Michael, Michael indicated that J.T. was a bad man. Michael also indicated that he did not know whether he would be safe at Mother's home, stating that one thing he did not like about living with Mother was that he was subject to "abuse."[25] During Kenneth's interview with the trial court, Kenneth stated that living with Mother was "a nightmare" and he would "be scared for [his] life to go ask [Mother] for something." Describing J.T. as the "boyfriend that burned down the other house," Kenneth stated that J.T. had "knocked [Mother] out." Moreover, Mother testified that her children were present during the incident where J.T. broke the window and that other past domestic-violence incidents with partners other than J.T. had occurred in front of her children.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence of an endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that Mother had knowingly placed or had knowingly allowed Breanna,

---

[25]Michael stated that Mother would beat her children with "like different things," but he did not want to tell the trial court what objects Mother would hit the children with because he was afraid that he would not go home if he told.

Hank, Hudson, and Holly to remain in conditions or surroundings that endangered their emotional or physical well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). And we hold that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Mother had engaged in conduct that endangered their physical or emotional well-being. *See id.* § 161.001(b)(1)(E).

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Mother had knowingly placed or had knowingly allowed Breanna, Hank, Hudson, and Holly to remain in conditions or surroundings that endangered their emotional or physical well-being and that Mother had engaged in conduct that endangered their physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E). We thus overrule Mother's first and second issues as they relate to Breanna, Hank, Hudson, and Holly.

### 4. Analysis as to J.T.

As previously noted, we conduct a consolidated review of Subsections (D) and (E). *See S.H.*, 2017 WL 4542859, at *10; *T.N.S.*, 230 S.W.3d at 439.

Here, the record reflects that J.T. also had a problem with illegal drugs. Multiple witnesses recounted that J.T. smoked marijuana with Ezra at the family's home, with Kenneth stating that "[J.T] smokes marijuana with [Ezra] in the bathroom

29

and on the patio all the time[.]" Mother testified that she had told J.T. that his smoking marijuana with Ezra was inappropriate, but J.T. continued to smoke marijuana with Ezra. At the termination trial, J.T. admitted to smoking marijuana "with children" at "[p]robably one time in the past," and he admitted that he had used cocaine "once [or] twice" in the past.

J.T.'s drug problems did not stay buried in the past. Rodgers testified that J.T. had missed two drug tests—one in November 2021 and one in December 2021—and that the Department considered a no-show on a drug test to be an "assumed positive result." The record also reflects that J.T. tested positive for opiates during this case. Although J.T. explained that this positive test result was due to taking Tylenol 3 following a work injury, he admitted that he did not have a prescription for Tylenol 3.

The record also reflects that J.T. had a propensity for domestic violence. As detailed above, Mother described numerous domestic-violence incidents involving J.T., some of which occurred while she was pregnant, one of which resulted in an assault conviction, and another which resulted in an assault charge that was pending at the time of the termination trial. When asked about some of his domestic-violence incidents with Mother, J.T. pled the Fifth Amendment. He pled the Fifth Amendment with respect to whether he had struck Mother with a closed fist in September 2020, when asked whether he had struck Mother in May 2019, with respect to whether he had ever assaulted Mother while she was pregnant with Holly

30

or Emily, and when asked whether he had assaulted Mother in December 2018 while Hank and Hudson were present.

The trial court was permitted to draw negative inferences from J.T.'s repeated invocations of the Fifth Amendment. *See In re E.S.*, No. 12-20-00282-CV, 2021 WL 2483788, at *5 (Tex. App.—Tyler June 17, 2021, pet. denied) (mem. op.) ("In a civil case, including a termination of parental rights case, a fact finder may draw an adverse inference against a party who pleads the Fifth Amendment."); *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *26 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) (similar); *see also* Tex. R. Evid. 513(c). The record further reflects that J.T.'s bond conditions required that he have no contact with Mother and that he had been living with Mother at least part of the time that the bond conditions were imposed.[26]

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence of an endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that J.T. had knowingly placed or had knowingly allowed Holly to remain in conditions or surroundings that endangered her emotional or physical well-being.

---

[26]J.T. pled the Fifth Amendment when asked whether his bond conditions prevented him from contact with Mother and when asked whether he had been living with Mother throughout this case.

*See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). And we hold that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that J.T. had engaged in conduct that endangered her physical or emotional well-being. *See id.* § 161.001(b)(1)(E).

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that J.T. had knowingly placed or had knowingly allowed Holly to remain in conditions or surroundings that endangered her emotional or physical well-being and that J.T. had engaged in conduct that endangered her physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E). We thus overrule J.T.'s first and second issues.

## C. Best Interest

In their third respective issues, Mother and J.T. each argue that the evidence is legally and factually insufficient to support the trial court's respective best-interest findings.

### 1. Standard of Review and Applicable Law

We review the parties' respective challenges to the sufficiency of the trial court's best-interest findings under the same review standards stated above regarding the conduct grounds. Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the

best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence that is probative of the predicate grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28. We also consider the evidence in light of the following nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a

finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.); *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

### 2. Analysis as to Mother

As to Breanna's, Hank's, Hudson's, and Holly's emotional and physical needs now and in the future and the emotional and physical danger to them now and in the future, the record reflects, as detailed above, that Mother has a continuing pattern of staying with violent partners. The record reflects that she continued to live with a violent partner for a while even after the latest September 2020 domestic-violence incident. While Mother testified at the termination trial that J.T. had moved into a hotel and that they were not living together anymore, a factfinder may measure a parent's future conduct by her past conduct, and the trial court could have inferred that domestic violence would continue to be a problem for Mother now and in the future. *See In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *5 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.); *In re E.M.*, 494 S.W.3d 209, 226 (Tex. App.—Waco 2015, pet. denied).

The trial court could have likewise inferred that Mother's drug problems were going to continue. Because Mother had a continuing pattern of drug abuse, as detailed above, the trial court could have inferred from Mother's past history of drug

34

use that she did not have the ability to meet Breanna's, Hank's, Hudson's, and Holly's physical and emotional needs now and in the future. *See R.H.*, 2019 WL 6767804, at *5 ("The trial court could have inferred from [father's] past history of instability, criminal conduct, and drug use that [father] did not have the ability to meet [child's] physical and emotional needs in the future."). The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to Breanna, Hank, Hudson, and Holly.

As to the plans for Breanna, Hank, Hudson, and Holly and as to the stability of the home or proposed placement, the record reflects that Breanna and Holly were living in an adoption-motivated foster home with Emily and that they had bonded well with their foster family.[27] The record further reflects that Hank and Hudson were also living in an adoption-motivated foster home and that they had bonded well with their foster family. Rodgers testified that the respective foster parents were meeting the respective needs of Breanna, Hank, Hudson, and Holly. While Mother

---

[27]In her brief, Mother complains about the care that Breanna and Holly were receiving from the foster family. She complains that the foster father refused to address Breanna by her given name, that the foster father had posted a photo of Breanna and Holly on social media labeling one photo "my girls," that he had exhibited "grooming-type behaviors," and that he had placed Breanna on food restrictions. At trial, the foster father addressed these concerns, explaining that Breanna went by a nickname that she chose for herself that was a shortened form of her given name, that Breanna had been placed on food restrictions upon the advice of a doctor, that he had removed the complained-of social media photo as soon as he knew it was an issue, and that he had simply taken Breanna on a "daddy-daughter" date. The trial court, as the sole judge of the foster father's credibility and demeanor, was entitled to accept the foster father's testimony. *See J.O.A.*, 283 S.W.3d at 346.

indicated that she planned for the children to be returned to her and that she hoped to change her work schedule so that she could spend more time with them, the record reflects years of instability in Mother's home life, with a multitude of Department intakes and numerous removals of Mother's children. The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to Breanna, Hank, Hudson, and Holly.

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we hold that a reasonable factfinder could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Mother and Breanna, Hank, Hudson, and Holly was in their best interest, and we therefore hold that the evidence is legally sufficient to support the trial court's best-interest finding as to them. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding as to them. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Mother's third issue as it relates to Breanna, Hank, Hudson, and Holly.

### 3. Analysis as to J.T.

As to Holly's emotional and physical needs now and in the future and the emotional and physical danger to Holly now and in the future, the record reflects, as detailed above, that J.T. has a continuing pattern of domestic violence and criminal

activity. Evidence was presented that he had been violent toward Mother on several occasions in the past, including while Mother was pregnant, that he had been convicted of assault against Mother, and that he had a pending assault charge. When J.T. was asked about some of these incidents, he pled the Fifth Amendment. As noted above, the trial court was free to draw negative inferences from J.T.'s repeated invocations of the Fifth Amendment. *See E.S.*, 2021 WL 2483788, at \*5; *M.A.A.*, 2021 WL 1134308, at \*26; *see also* Tex. R. Evid. 513(c).

The record further reflects, as detailed above, that J.T. had problems with drug abuse both before and after removal. The trial court could have inferred from J.T.'s past history of violence, drug use, and criminal activity that he did not have the ability to meet Holly's physical and emotional needs now and in the future. *See R.H.*, 2019 WL 6767804, at \*5; *E.M.*, 494 S.W.3d at 226. The trial court was entitled to find that these factors weighed in favor of terminating J.T.'s parental rights to Holly.

As to J.T.'s plans for Holly and the Department's plans for Holly, the record reflects that Holly is in an adoption-motivated foster home with Breanna and Emily and that she has bonded with the foster family. Rodgers testified that Holly's foster home was "safe, stable, and loving." J.T.'s plans for Holly included reliance on family support that included his mother, but the record reflects that J.T.'s mother had previously been excluded as a possible placement for Holly because of evidence of prior, unrelated abuse. The trial court was entitled to find that this factor weighed in favor of terminating J.T.'s parental rights to Holly.

37

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we hold that a reasonable factfinder could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between J.T. and Holly was in Holly's best interest, and we therefore hold that the evidence is legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule J.T.'s third issue.

## IV. CONCLUSION

Having overruled Mother's three issues as they relate to Breanna, Hank, Hudson, and Holly, and having overruled J.T.'s three issues, we affirm the trial court's termination order regarding Mother's parental rights as it relates to Breanna, Hank, Hudson, and Holly, and J.T.'s parental rights as to Holly. Having sustained Mother's three issues as they relate to Kenneth and having sustained K.R.'s six issues—due to the Department's abandonment of its pleadings to terminate Mother's and K.R.'s respective parental rights to Kenneth—we reverse the trial court's termination order to the extent that it terminates Mother's and K.R.'s respective parental rights to Kenneth, and we remand the matter to the trial court for further proceedings consistent with this opinion. *See E.H.*, 2021 WL 799890, at *3 (remanding matter to

trial court for further proceedings after holding Department abandoned its pleadings seeking termination of parent's parental rights); *T.M.*, 2020 WL 4773207, at *3 (same).

/s/ Dana Womack

Dana Womack
Justice

Delivered:  September 22, 2022